AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, a New Jersey membership corporation, and Deborah D. Jacoby, Plaintiffs,

v.

CITY OF LONG BRANCH, et al., Defendants, Congregation Brothers of Israel, Inc., Rabbi Tobias Roth, et al., Defendants-Intervenors.

Civ. No. 87–1822 (AET).

United States District Court, D. New Jersey.

Oct. 2, 1987.

Levy & Robertson by Lewis H. Robertson, Asbury Park, N.J., for plaintiffs.

Cerrato, O'Connor, Dawes, Collins, Saker & Brown, P.A., Freehold, N.J., for defendants Monmouth County, D'Amico, Vallapiano, Naorzanick, Powers and Larrison.

Gagliano, Tucci, Iadanza & Reisner, West Long Branch, N.J., for defendants City of Long Branch, Pallone, Cofer, Hayes, Palughi and Tobia.

Zager, Fuchs, Leckstein, Kauff and Needle, Red Bank, N.J., for proposed defendants-intervenors.

## OPINION

ANNE E. THOMPSON, District Judge.

This matter comes before the court on a motion by plaintiffs ACLU and Deborah Jacoby ("ACLU") for a preliminary injunction to prevent any further steps toward the creation of an eruv within the City of Long Branch and on a motion to dismiss by defendant-intervenors Congregation Brothers of Israel ("Congregation"). Inasmuch

as this court heard testimony on this matter on August 6, 1987 and affidavits and depositions have been submitted to the court, we will treat the motion to dismiss as a motion for summary judgment, F.R. C.P. Rule 12(b). On May 8, 1987 this court denied the ACLU's motion for a temporary restraining order. This lawsuit was originally filed by the ACLU solely against the City of Long Branch. On August 6, 1987 at oral argument the court granted the request of the Congregation Brothers of Israel to intervene as a defendant in this action.

Plaintiff ACLU alleges that the creation of an eruv with its boundary markers on public property violates the establishment clause of the First Amendment to the United States Constitution and Article 1, ¶¶ 3 and 4 of the New Jersey Constitution. An eruv, under Jewish law, is an unbroken delineation of an area. The demarcation of the eruv boundary is primarily created using existing telephone poles and fences with wires connecting them and with small half-rounds attached to the sides of the poles. The designation of an eruv allows observant Jews to carry or push objects from place to place within the area during the Sabbath. Within the eruv observant Jews may push baby carriages from their homes to the synagogue or to other homes, carry books to the synagogue, and carry food to one another's homes. Pushing and carrying are not permitted in the public domain on the Sabbath; however, the creation of an eruv district permits such actions by creating the legal fiction of a "private domain."

In order to delineate the eruv in Long Branch the Congregation is using existing utility poles, telephone poles and fences connected by wires. The Congregation has also been authorized by the city, at the Congregation's expense, to erect two additional poles, extend a fence, and raise the pole at the end of a fence. The city's resolution establishing the eruv and authorizing the Congregation to erect the poles and fence extension on public property is the focus of plaintiffs' challenge in this case.

On June 15, 1985 the Council of the City of Long Branch adopted a resolution authorizing the creation of an eruv within Long Branch. On July 11, 1985 the Board of Chosen Freeholders of Monmouth County adopted an identical resolution. After a number of revisions the final plan for the eruv calls for the use of existing telephone poles and for the installation of two additional poles, a fence extension and one fence pole at the Congregation's expense. The ACLU and Ms. Jacoby allege that the demarcation of the eruv using poles and fences erected on public property violates the "constitutional proscription against governmental action respecting an establishment of religion." (Complaint, ¶ 31). Plaintiffs maintain that the creation of an eruv constitutes the placement of "permanent symbols" of the Jewish religion on public property. (Complaint ¶ 43).

The defendants allege that plaintiffs do not have standing to raise these claims. The defendants argue that the plaintiffs ACLU and Ms. Jacoby cannot bring this lawsuit because they have not shown a particular injury that has been inflicted on them by the creation of the eruv. The court finds that Ms. Jacoby and the ACLU, on behalf of its members who reside in Long Branch, do allege personal injuries suffered as a consequence of the alleged constitutional violation sufficient to confer standing on them. Their allegations that their access to the park and/or to particular parts of the park has been impeded as well as their aesthetic objections to the poles and the fence are palpable injuries different from "the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982). We find that the ACLU on behalf of its Long Branch members and Ms. Jacoby have alleged sufficient aesthetic and environmental injuries to have standing to sue. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

■ Plaintiff ACLU argues that the authorization for the eruv and the erection of the poles and fence on public property violate the establishment clause of the First Amendment as applied to the states by the Fourteenth Amendment. As set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), state action must meet a three-part test in order to avoid violating the establishment clause. The state action must (1) have a secular purpose; (2) have a principle effect which does not advance religion; and (3) not foster excessive entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111–12. The court notes at the outset that the establishment clause does not forbid all interaction between religious organizations and the state. Certain accommodations by the state will always be necessary in order to insure that people of all religions are accorded the rights given them by the free exercise clause of the First Amendment. *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

■ In order to determine whether there is a secular purpose for actions taken by the City of Long Branch we must examine what the city did and what the effect of the actions has been. The city's actions appear to be limited to granting the Congregation the right to erect two additional utility poles, extend a fence and lengthen a fence pole in order to create an eruv in which observant Jews may engage in secular activities on the Sabbath, such as carrying a book or pushing a baby carriage to the park. As the City of Long Branch notes in its brief, the secular purpose of this resolution is that it allows a large group of citizens access to public properties. Within the eruv district they may go to the park, push a baby carriage on public streets, and visit friends. The eruv which the city has allowed the Congregation to create is not a religious symbol. Neither the boundary markers of the eruv nor the eruv itself have any religious significance. They are not objects of worship nor do they play any theological role in the observance of the Sabbath. Under Jewish law the eruv does not alter the religious observance of the Sabbath, it merely allows observant Jews to engage in secular activities on the Sabbath. The court finds that the City of Long Branch has established a secular purpose for its authorization permitting the delineation of an eruv in Long Branch.

■ By permitting the synagogue to use its own funds to create an almost invisible boundary in which its members may engage in secular activities on the Sabbath, the City of Long Branch is not putting its imprimatur on any public manifestation of religion, such as moments of prayer in public schools or the posting of the ten commandments on classroom walls. *Wallace v. Jafree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). Providing equal access to public facilities to people of all religions and enabling individuals to get to and from their chosen places of worship safely are permissible accommodations by the government. The government is permitted to fix sidewalks outside churches, provide police protection and basic utilities for mass outdoor religious gatherings, provide police to direct traffic into synagogue parking lots and authorize a house of worship to install additional street lights on public property to facilitate access to evening services. *See O'Hair v. Andrus,* 613 F.2d 931 (D.C. Cir.1979), and L. Tribe, *American Constitutional Law* 839–840 (1978).

The city allowed the eruv to be created to enable observant Jews to engage in secular activities on the Sabbath. This action does not impose any religion on the other residents of Long Branch. Residents are not confronted with any visible religious symbolism in their community, in fact the only visible alterations are two additional utility poles, an additional piece of fence, and some half-rounds on the sides of existing poles. None of these objects have any religious significance. Residents are not subjected to religious words coming from those employed by the government, such as teachers in public schools, nor has any religious group been given any authority to mandate behavior in the community. The eruv does not alter the observance of the Sabbath by observant Jews, these congre-

gants will continue to observe the Sabbath as they have all their lives and as they would without an eruv. The eruv merely permits them to participate in such secular activities as pushing a stroller or carrying a book while observing the Sabbath.

■ Under the *Lemon* test the defendants must also show that the city's resolution does not advance any particular religion. As noted above the existence of the eruv does not impose the Jewish religion on other residents of Long Branch, it merely accommodates the religious practices of those residents who are observant Jews. Since it is permissible to construct houses of worship on public land at an airport to enable travelers and airport employees to practice their religions, it is certainly permissible to unobstrusively demarcate an area as an eruv to permit observant Jews to engage in secular activities while they practice their religion. *See Brashich v. Port Authority of New York and New Jersey*, 484 F.Supp. 697 (1979), *aff'd.* 791 F.2d 224 (2d Cir.1980); *see also O'Hair v. Andrus*, 613 F.2d 931 (D.C.Cir.1979) (Permissible to allow Pope to hold service on public property and for city to provide police, fences, barriers and utilities). While governments may provide some services and access to public property to enable individuals to enjoy the free exercise of religion, governments cannot construct religious symbols. The City of Long Branch may allow the Congregation to delineate an eruv; however, the City of Philadelphia cannot pay for the construction of a platform and a 36 foot-high cross for the Pope to conduct mass. *Gilfillan v. City of Philadelphia*, 637 F.2d 924 (3d Cir.1981), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845. In *Gilfillan* the objects were constructed at the city's expense and were not only actual religious objects but were also used in the religious ceremony which took place.

In the case now before this court no religious symbol has been erected. As Rabbi Roth, of the Congregation Brothers of Israel, testified before this court the eruv itself has no religious significance or symbolism and is not part of any religious ritual. The eruv is basically invisible to Long Branch residents as it utilizes existing poles and wires with the addition of wooden half-rounds attached to the sides of the poles. The two additional poles and the fence extension will not significantly alter the existing environment. Having examined pictures of the eruv boundaries, the court finds that the boundaries are invisible in that they look just as they looked prior to being designated as the eruv's boundaries. The eruv sends no religious message to the rest of the community. Its existence could not be discerned by anyone who has not been shown the boundaries. An eruv does not in any way force other residents to confront daily images and symbols of another religion. As the court noted in *Smith v. Community Board No. 14*, 128 Misc.2d 944, 491 N.Y.S. 2d 584, 587 (Sup.1985), *aff'd*, 518 N.Y.S.2d 356 (N.Y. App.Div.1987), accommodating the religious customs of one group by permitting the creation of an eruv does not necessarily advance any one religion as proscribed by the *Lemon* test. As long as there is no evidence that Long Branch has refused to accommodate other religious groups and since the city will spend no money on the eruv, permitting the eruv is an acceptable accommodation and does not improperly advance religion.

Finally, the court must ask whether the actions by the City of Long Branch permitting the demarcation of the eruv constitute an excessive entanglement with religion. In order to make this determination we must review "the character and purpose of the institutions that are benefited, the nature of the aid that the state provides, and the resulting relationship between the government and the religious authority." *Lemon v. Kurtzman*, 403 U.S. at 615, 91 S.Ct. at 2112. Permitting the demarcation of the eruv enables observant Jews who reside in the area to engage in some secular activities on the Sabbath. The existence of the eruv does not provide improper benefit to a religious institution. The aid provided by the government in this instance is *de minimus*. The city permitted the Congregation to erect two utility poles, lengthen a fence pole and extend a fence.

All the work will be done at the Congregation's expense. The city is expending no funds on the project. It has provided no aid other than the passage of the resolution permitting the boundary of the eruv to be delineated. The ACLU had not shown that the resulting relationship between the government and the religious group violates the First Amendment. The synagogue is not being given any power by the city. It has been given permission to construct two poles, lengthen a pole and extend a fence. It has no authority to do anything other than this small bit of construction. The Congregation has no power to make decisions on matters that are within the governmental domain. Unlike in *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), in the instant case there is no indication that an improper assignment of governmental authority to a religious group has been made.

Furthermore, the Congregation is responsible for maintaining and insuring the objects it erects. The fact that the city may find it necessary to ascertain that the items are being maintained correctly does not constitute improper aid or entanglement, rather it is similar to the state's burden of ascertaining whether tax-exempt property is being used for religious purposes. *Lemon*, at 614, 91 S.Ct. at 2112. There is no reason why "detailed monitoring" and "close administrative contact" will be necessary. *See Aguilar v. Felton*, 473 U.S. 402, 414, 105 S.Ct. 3232, 3239, 87 L.Ed.2d 290 (1985). The existence of the eruv will not cause "a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize." *Aguilar*, 473 U.S. at 414, 105 S.Ct. at 3239 (quoting *Walz v. Tax Commission*, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1978)). Although the initial proposal for the eruv raised some problems that necessitated a number of meetings between city officials and representatives of the Congregation, now that a very simple final plan has been developed there is no reason why that type of interaction should continue. In fact, in the future it would appear that contact between the Congregation and the city regarding the eruv would be minimal.

Although the synagogue's initial proposal which involved erecting some fifty or sixty additional poles engendered some disputes within the community, the court sees no indication that the existence of the eruv under the current plan will cause the kind of continuing political divisiveness within the community anticipated by the Supreme Court in *Lemon*. 403 U.S. at 622, 91 S.Ct. at 2115. In all probability residents other than those who actively participated in the initial debate and those observant Jews who are provided with a map of the eruv's boundaries will never *see* the eruv nor will they be able to discern its boundaries. Their own freedom to practice their religion or not to practice any religion will not be interfered with at all. The court finds that no violation of the First Amendment to the Constitution has been stated.

Plaintiffs also argue that the actions of the City of Long Branch are in violation of Article 1, ¶¶ 3 and 4 of the New Jersey Constitution. Both of these provisions prohibit the establishment of religion and protect the individual's right to freedom of religion. In cases concerning whether a governmental action violates the state constitution's prohibition on the establishment of religion, the New Jersey Supreme Court has held that it will apply the federal standard as enunciated by the United States Supreme Court. *Right to Choose v. Byrne*, 91 N.J. 287, 313–14, 450 A.2d 925 (1982). As this court has already applied the *Lemon* test as set forth by the United States Supreme Court and concluded that the permission to create an eruv does not violate the establishment clause of the First Amendment to the United States Constitution, we now conclude that the City of Long Branch's actions do not violate the establishment prohibitions found in Article 1, ¶¶ 3 and 4 of the New Jersey Constitution.

As no violation of the First Amendment to the United States Constitution has been stated and no violation of Article 1, ¶¶ 3 and 4 of the New Jersey Constitution has been shown, the court will grant the de-

fendants' motion for summary judgment. The court will deny plaintiffs' motion for a preliminary injunction. The court will enter its own order.