**Herb FREILER, Sam Smith, and John Jones,**

v.

**TANGIPAHOA PARISH BOARD OF EDUCATION, E.F. Bailey, Robert Caves, Maxine Dixon, LeRoy Hart, Ruth Watson, Donnie Williams, Sr., Art Zieske, and Ted Cason.**

**Civil Action No. 94–3577.**

United States District Court,
E.D. Louisiana.

Aug. 8, 1997.

James Robert Hashek, Roberts, Katz & Baudier, New Orleans, LA, for Plaintiffs.

William D. Treeby, Barry W. Ashe, Stone, Pigman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, Kenneth F. Sills, Hammonds & Sills, Baton Rouge, LA, for Defendants.

## FINDINGS AND CONCLUSIONS

LIVAUDAIS, District Judge.

This is an action challenging the constitutionality of a resolution mandating that a disclaimer of endorsement of the scientific theory of evolution be read by all teachers in Tangipahoa Parish public schools to their students prior to presenting the subject matter of this material in class. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution of the United States. The following findings of fact and conclusions of law are rendered on the basis of the record, the evidence presented by the parties

in their stipulation of facts and submission of exhibits, their memoranda of law, proposed findings and conclusions and reply briefs, and the law.

## I.

Plaintiff Herb Freiler is the· father of the minor child Sydney Michelle Freiler, who attends a Tangipahoa Parish public school. Both Herb and Sydney Freiler reside in Tangipahoa Parish within the jurisdiction of the Tangipahoa Parish School Board ("the School Board")

Plaintiff Sam Smith (pseudonym) is the father of two children, who attend Tangipahoa Parish public schools. All three reside within the jurisdiction of the Tangipahoa Parish School Board.

Plaintiff John Jones (pseudonym) is the father of a child who attends a Tangipahoa Parish public school. They reside in the jurisdiction of the Tangipahoa Parish School Board.

Defendant Tangipahoa Parish Board of Education is a political subdivision of the State of Louisiana, organized pursuant to LSA–R.S. 17:51 et seq, for the purpose of providing public education to the schoolchildren residing within Tangipahoa Parish.

Defendants E.F. Bailey, Robert Caves, Maxine Dixon, Leroy Hart, Ruth Watson, Donnie Williams, Sr., and Art Zieske, at all pertinent times elected members of the School Board and residents of Tangipahoa, were sued exclusively in their official capacities as members of the School Board. Defendant Ted Cason was the Superintendent of Tangipahoa Parish Schools and was employed by the School Board. He was responsible for implementing the School Board's policies until his retirement in 1995 and is sued exclusively in his official capacity as former Superintendent of Schools

On April 19, 1994, the School Board adopted the following resolution, which shall be referred to as "the disclaimer":

Whenever, in classes of elementary or high school, the scientific theory of evolution is to be presented, whether from textbook, workbook, pamphlet, other written material, or oral presentation, the following statement shall be quoted immediately before the unit of study begins as a disclaimer from endorsement of such theory.

It is hereby recognized by the Tangipahoa Board of Education, that the lesson to be presented, regarding the origin of life and matter, is known as the Scientific Theory of Evolution and should be presented to inform students of the scientific concept and not intended to influence or dissuade the Biblical version of Creation or any other concept.

It is further recognized by the Board of Education that it is the basic right and privilege of each student to form his/her own opinion or maintain beliefs taught by parents on this very important matter of the origin of life and matter. Students are urged to exercise critical thinking and gather all information possible and closely examine each alternative toward forming an opinion.

The resolution was proposed by School Board member E.F. Bailey. School Board members E.F. Bailey, Robert Caves, Leroy Hart, Ruth Watson and Art Zieske voted in favor of the resolution and School Board members Logan Guess, C. Howard Nichols, Maxine Dixon and Donnie Williams voted against the resolution. Thus, the resolution was passed by a vote of 5 to 4.

Prior to the time this resolution was introduced, the Education/Curriculum Committee of the School Board considered adopting an official written document entitled *Policy on the Inclusion of Religious Materials and Discussions on Religion in the Curriculum and in Student Activities* and a *Revised Draft of Policy.* These documents were presented by Art Zieske, School Board member, for consideration by the Committee. These documents do not mandate the teaching of alternative theories to the origin of mankind, but do allow the teaching of Creation Science. Creation Science, as the term shall be used herein, is the theory that the universe, including all forms of life, was created literally in the manner described in the Bible by a higher Being, or, as alternately described, the theory of intelligent design or creation by a Divine Creator.

During the initial introduction of the proposed policy at a Committee meeting held on December 15, 1993, several members of the public expressed opinions concerning the proposed policy. The minutes of the meeting reflect that most, if not all, of the persons speaking at the meeting understood that the policy would allow the teaching of Creation Science, and most, if not all, of the opinions related at the meeting were either in support of or against the teaching of Creation Science. No other portion of the proposed policy, such as the Graduation ceremony prayer policy or the distribution of religiously oriented materials in the public schools, was discussed in any detail. The topic of Creation Science dominated the discussion.

The *Revised Draft of Policy* (Joint Exhibit 6) was on the School Board's March 1, 1994 agenda. After discussion, items 3 and 6 in the *Revised Draft of Policy*, which concerned the study of Creation Science and the Graduation Ceremony Prayer Policy, were not approved. Items 1, 2, 4, and 5, which provided that no religious belief or non-belief be promoted or disparaged by the School System, that religious materials may be included in the secular programs teaching literature, art, humanities, ethics and history, and that artistic expressions, such as music, drama, and art, may have religious themes if they are presented objectively "as a traditional part of the cultural and religious heritage of the particular holiday" were approved. The adopted policy also preserved the right of students to distribute "religiously oriented materials such as holiday greeting cards and newspapers so long as the school's rules pertaining to content-neutral time, place and manner restrictions to prevent disruption of the educational process [were] followed."

Board member E.F. Bailey introduced the endorsement disclaimer at issue herein at the April 19, 1994 School Board meeting. Instead of initially attempting to obtain the approval of the policy committee, Bailey introduced the matter to the entire School Board. An extended discussion took place between several of the Board members, Chris Moody, who is legal counsel for the Board, and Freiler, a plaintiff, concerning the disclaimer proposal.

Logan Guess, one of the School Board members who voted against the disclaimer, raised concerns about the inclusion of the phrase "Biblical version of creation", stating:

The second paragraph, the way it states 'not intended to influence or dissuade the Biblical version of creation or any other concept,' the question I have is, if—if you want to endorse or suggest that students form their own opinions, my question about the Biblical version of creation, what about maybe non-Christian students, students who don't necessarily conform or believe in the Biblical version? My only question is, what about people of other faiths, other than the Christian faith, who believe in other versions of the origin of man, whether it be creation, evolution, whatever they may believe in . . . .

Let me go on to—to conclude that. My concern is if we include the statement about the Biblical version of creation, it seems to me that that will open us up to—to questions from people of other beliefs who would criticize and take issue with the fact that we're singling out the Biblical version of creation Even though there are many, many other versions of creation besides the one that maybe the people in this room adhere to, being the Holy Bible, which I individually and personally believe, but there are many other people that may not believe in that particular version of creation.

Transcript of Tangipahoa Parish Board of Education meeting, April 19, 1994, pp. 5–6 (Joint Exhibit 2).

Board member Guess later explained his objection to the inclusion of the phrase "Biblical version of creation," in this manner:

Can I give you an example of the problem that I have? Is everybody says [sic] 'the Biblical version of creation or any other concept.' Well, we mentioned 'any other concept,' but we mentioned specifically the Biblical version of creation. What if we substituted the Biblical version for the Hindu version of creation or any other concept, or the American Indian version of creation or any other concept? Would anybody in this room vote to do that? I don't think so. That's my point.

Transcript of School Board meeting, April 19, 1994, pp. 23–24 (Joint Exhibit 2).

In explaining why he rejected the suggestion that the phrase "the Biblical version of creation" be deleted, Board member Bailey, who introduced the proposal, explained:

Why—why would we—I—I—I couldn't accept that and I think you deserve to hear why. I think by that, you've gutted the basic message of this document. And I appreciate where you're coming from. I don't apologize for that position.

Transcript of School Board meeting, April 19, 1994, p. 13 (Joint Exhibit Z).

In further answering Guess' questions about the disclaimer, Bailey responded:

Mr. Chairman, let me answer this. Mr. Guess is speaking as an individual on that. Let's just face facts. We can talk about Hindu, we can talk about Mohammed, we can talk about all this other stuff, but there are two basic concepts out there and usually you call them—in fact, you would be hard pressed probably to find many that you would call on one or the others. Now, I happen to feel that a large, large percentage, perhaps 95 percent, fall into the category of believing in divine creation. But the whole point is that those are the two main concepts and I don't think we need shy away, or hide away from saying that this is not to dissuade from the Biblical version.... You know, I want to preempt my closing remarks, Mr. Chairman, but I'm just telling you that that needs to be put in that particular part of this document and clearly stated so that it will be clearly understood by any and all as to exactly what we mean to say. And that—that's all we're trying to do there. And—And to be out front, the Board way what we're trying to say; we're criticized so often with being abstract and these sorts of things. You know, say what you want to say. And that's what his document does.

Transcript of School Board meeting, April 19, 1994, pp. 25–26 (Joint Exhibit 2).

In his closing remarks, immediately prior to the vote on the policy statement, Bailey summarized the reasons he offered the proposal:

Let me—Let me say this. Hopefully this can maybe put this thing in perspective. But if it were a government class, a history class at school, and the teacher got up and was going to talk about various forms of government ... and he or she talked about the dictatorial form of government and didn't mention democracy, and then went on to another subject, wouldn't people stop and say "Hey, wait, didn't you forget democracy? Don't we live in a democracy? You forgot about that. Hey, wait, don't go any further." And—And isn't that—Is that what we're doing now? Isn't it so that a large percentage, something in the 90 percent of our youngsters, are taught, from infancy on up, that—that God created all life and matter? And we—And those kids were sent to school, they get in that classroom at that young age of, what, third, fourth grade or whatever, here comes their first science textbook, here comes their first science class, and here comes this same thing of the analogy of government; somebody comes and tells them that they are a mere accident, that—that they're a product ... of the Big Bang theory and that that's why they are here, and the kid is thinking and saying, "Wait a minute. This doesn't coincide with what my parents taught me. This is not what I learned in Sunday school.". . .

Folks, I'm just telling you that I can't go on being any—any part of that and—I'm going to give it my best effort and now you have your opportunity to change things. We're not here tonight to ask you to adopt creationism. We were here a month ago or two months ago asking that, and—and we understand that and—but we are simply asking this as a very reasonable compromise, for this disclaimer, to put this thing in perspective.

We—We—We would like that it not be taught as fact. That youngster, when that material is presented to him, and he reads it out of a textbook, it is—it is thought to be fact when there is nothing disclaiming it, or there is not another lesson given to explain other concepts. What else can he do except take it for fact? I did. . . .

I feel this is very reasonable and it—it's terribly important. It's—It's important because there is so much riding on a youngster's concept of the origin ... of life and matter. If it was an accident, life is not important, because, you see, it's just an accident. Human lives are not important, that means that this thing of abortion is—gives more validity to that, because life is not important, and—and the fact that the crime record—crime rate is sweeping our nation, sweeping our state, you see, it gives credibility there because life is not important because we are just here by accident ... I just want to tell you how important, how eternally important this vote is. So when this roll call vote is made, I just urge you to support what I feel is a very reasonable compromise.

Transcript of School Board meeting, April 19, 1994, pp. 29–33 (Joint Exhibit 2).

At the April 19, 1994 meeting, no member of the School Board listed any non-religious theory for the origin of life and matter, except for a casual mention of the "Big Bang" theory. All of the "other concepts" which the School Board members intended "not to influence or dissuade" were religious, including the Biblical version of Creation, which was listed in the disclaimer, as well as others which were not specifically listed, such as the Hindu version, Islamic version, or the American Indian version.

In the trial testimony, Board member Bailey stated that the reason he proposed the disclaimer was due to the discontent of his constituents with the teaching of evolution as fact. Bailey testified that his constituents do not share the belief in evolution, that they believe the Biblical version of creation, and that they "resent their children being confused with the presentation of the theory of evolution."

During the discussion of the proposed resolution, no Board member stated that the reason the disclaimer was being introduced was to urge students to exercise their critical thinking skills or to examine all alternatives when forming opinions, purposes later embraced by Board members in depositions or in trial testimony. The discussions at the proposed meeting centered on the strong belief by certain Board members that schoolchildren should not be taught evolution as fact, that they would be confused by the teaching of evolution in public school because most of the children are taught the Biblical theory of creation or creation by a Higher Being in Sunday School.

The students in Tangipahoa Parish Public Schools are encouraged to exercise critical thinking skills in all classes, including science classes. Even before the adoption of the disclaimer resolution, students being taught evolution in science classes had the right to discuss any alternative theories other than evolution in class, and teachers were free to mention concepts concerning the origin of life and matter other than evolution and encourage students to consider them. Despite this, the teaching of evolution has created controversy for many years in Tangipahoa Parish Public Schools, as well as in other schools and communities.

The School Board mandates no disclaimer prior to the teaching of any other subjects or theories in Tangipahoa Parish Public Schools. It does require that parents sign consent forms prior to the teaching of sex education and before their child viewed an edited version of the movie *Schindler's List*.

To date of trial, implementation of the disclaimer has not been enforced by the School Board.

## II.

The challenge to the disclaimer mounted by the plaintiffs arises out of the First Amendment to the United States Constitution, which proclaims simply that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" and out of Article 1, § 8 of the Louisiana Constitution, which states that "No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof."[1] The issue presented is

1. The prohibitions contained in the First Amendment to the United States Constitution were rendered applicable to the states in the Fourteenth Amendment.

whether this disclaimer violates the Establishment Clause.[2]

There is a plethora of jurisprudence interpreting this clause. While there have been decisions which have not named it specifically, the decision in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) enunciated the seminal method of analysis (dubbed the *Lemon* test) to be employed when determining whether governmental action runs afoul of the Establishment Clause, as follows:

> Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion [citation omitted]; finally, the statute must not foster 'an excessive government entanglement with religion' [citation omitted].

403 U.S. at 612–613, 91 S.Ct. at 2111. If the proposed legislation does not satisfy each of these prongs, it violates the Establishment Clause. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

There has been much criticism of the Lemon test by members of the Court, but nevertheless, as recently as June 23, 1997, the Supreme Court in *Agostini v. Felton,* —— U.S. ——, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), applied the *Lemon* test in analyzing whether the Title I program administered by the Board of Education of the City of New York violated the Establishment Clause. It concluded that "New York City's Title I program does not run afoul of any of the three primary criteria we currently use to evaluate whether government aid has the effect of advancing religion: it does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." This decision was delivered by Justice O'Connor and joined by Chief Justice Rehnquist and Justices Scalia Kennedy and Thomas.[3]

While several Justices have sought to abandon the *Lemon* test, even one of its most vehement detractors, Justice Scalia,[4] has

---

**2.** Since the language in both the federal and state constitution are identical in this respect, the clauses at issue shall be referred to in the singular as "the Establishment Clause."

**3.** Justice Scalia has frequently been critical of the *Lemon* test, as this excerpt from his dissent in *Lee v. Weisman, Lee v. Weisman,* 505 U.S. 577, 644, 112 S.Ct. 2649, 2685, 120 L.Ed.2d 467 (1992) demonstrates:

> Our Religion Clause jurisprudence has become bedeviled (so to speak) by reliance on formulaic abstractions that are not derived from, but positively conflict with, our long-accepted constitutional traditions. Foremost among these has been the so-called *Lemon* test [citation omitted], which has received well-earned criticism from many Members of this Court.... The Court today demonstrates the irrelevance of *Lemon* by essentially ignoring it, .... and the internment of that case may be the one happy byproduct of the Court's otherwise lamentable decision. Unfortunately, however, the Court has replaced *Lemon* with its psycho-coercion test, which suffers the double disability of having no roots whatever in our people's historic practice, and being as infinitely expandable as the reasons for psychotherapy itself.

**4.** In his concurrence in *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S.

384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), Justice Scalia attacks the majority's application of the *Lemon* test, as follows:

> As to the Court's invocation of the *Lemon* test: Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys of Center Moriches Union Free School District. Its most recent burial, only last Term, was, to be sure, not fully six-feet under: our decision in *Lee v. Weisman,* 505 U.S. 577 *[585],* 112 S.Ct. 2649, 2654 [120 L.Ed.2d 467] (1992), conspicuously avoided using the supposed 'test' but also declined the invitation to repudiate it. Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart (the author of today's opinion repeatedly) and a sixth has joined an opinion doing so. [Citations omitted].
>
> The secret of the *Lemon* test's survival, I think, is that it is so easy to kill. It is there to scare us (and our audience) when we wish it to do so, but we can command it to return to the tomb at will. See, e.g., *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362 (1984) (noting instances in which Court has not applied *Lemon* test). When we wish to strike

joined in the majority opinion in *Agostini*, which invokes the test in reversing its prior decisions in *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) and *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) Thus, the *Lemon* analysis remains the method by which Establishment Clause challenges must be judged.

### III.

■ In order to satisfy the first prong of the Lemon test, the resolution must have a secular legislative purpose. The Supreme Court in *Edwards v. Aguillard*, 482 U.S. at 585, 107 S.Ct. at 2578, studied the legislative purpose underlying the passage by the Louisiana Legislature of the "Balanced Treatment for Creation–Science and Evolution–Science in Public School Instruction" Act (Creationism Act). The *Edwards* Court analyzed both the official stated purpose and the motivations behind the promulgation of the statute, as evidenced by the discussion of the legislative sponsor and other legislators, to determine the true purpose. The Court explained:

> A governmental intention to promote religion is clear when the State enacts a law to serve a religious purpose. This intention may be evidenced by promotion of religion in general [citation omitted], or by advancement of a particular religious belief [citation omitted]. If the law was enacted for the purpose of endorsing religion, 'no consideration of the second or third criteria [of *Lemon* ] is necessary.' *Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985).

down a practice it forbids, we invoke it, see, e.g., *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (striking down state remedial education program administered in part in parochial schools); when we wish to uphold a practice it forbids, we ignore it entirely, see *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330 [77 L.Ed.2d 1019] (1983) (upholding state legislative chaplains). Sometimes, we take a middle course, calling its three prongs 'no more than helpful signposts,' *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868 [37 L.Ed.2d 923] (1973). Such a docile and useful monster is worth keeping around, at least in a somnolent state; one never knows when one might need him.

*Edwards*, 482 U.S. at 585, 107 S.Ct. at 2578. The Court remarked that:

> [The Supreme Court] has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

*Edwards*, 482 U.S. at 584, 107 S.Ct. at 2577.

■ The *Edwards* Court noted that while the Creationism Act's stated purpose was to protect academic freedom, such a goal was not furthered by either the outlawing of the teaching of evolution or the mandating of the teaching of creation science. "While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham." *Edwards*, 482 U.S. at 586–587, 107 S.Ct. at 2579. In finding that the stated purpose was not the true reason that the Act was passed, the Court recognized that Louisiana public school teachers already possessed the flexibility "to supplant the presentation of theories, besides evolution, about the origin of life. [Teachers in Louisiana could teach any 'scientific concept that's based on established fact' prior to the passage of the legislation]. The Act provides Louisiana school teachers with no new authority." *Id.* The Court found that therefore

For my part, I agree with the long list of constitutional scholars who have criticized *Lemon* and bemoaned the strange Establishment Clause geometry of crooked lines and wavering shapes its intermittent use has produced.... I will decline to apply *Lemon*—whether it validates or invalidates the government action in question—and therefore cannot join the opinion of the Court today.

508 U.S. at 398–400, 113 S.Ct. at 2150. Nevertheless, Justice Scalia joined the majority opinion in *Agostini*, as did four other justices, with no mention of departing from the *Lemon* test. Thus, the rumors about the departure of *Lemon* have been greatly exaggerated. As made evident in *Agostini, Lemon* lives.

the stated purpose is not furthered by the Act.

Instead, the *Edwards* Court found that "because the primary purpose of the Creationism Act is to endorse a particular religious doctrine, the Act furthers religion in violation of the Establishment Clause." 482 U.S. at 595, 107 S.Ct. at 2583. The Act required that whenever evolution was taught in public schools, creationism, the religious viewpoint that a supernatural being created humankind, also be taught. In concluding that the Act had a religious purpose, the Court recognized that the true purpose fostered the Act was to restructure the science curriculum to conform with the doctrine of religious groups espousing as one of its primary tenets the belief that humans were created by a Divine Creator. No other science subject was burdened with the mandate that alternative theories be taught, although the teachers had the flexibility prior to the Act to discuss a variety of theories about the origin of life.

In another decision touching upon the Establishment Clause's application in an elementary public school setting, the Supreme Court in *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), found that an Alabama statute authorizing a period of silence for "meditation or voluntary prayer" was a law respecting the establishment of religion within the meaning of the First Amendment and thus was in violation of it. 472 U.S. at 41–42, 60, 105 S.Ct. at 2482, 2492. In reaching this conclusion, the Court explained the important policy reasons supporting the First Amendment's Establishment Clause, as follows:

> Just as the right to speak and the right to refrain from speaking are complementary components of a broader concept of individual freedom of mind, so also the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority. At one time it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among 'religions'—to encompass intolerance of the disbeliever and the uncertain. As Justice Jackson eloquently stated in *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187 [87 L.Ed. 1628] (1943):

>> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

> The State of Alabama, not less than the Congress of the United States, must respect that basic truth.

*Wallace,* 472 U.S. at 52–55, 105 S.Ct. at 2487–2489.

■ The *Wallace* Court recognized that it was the first *Lemon* criterion, that of the secular or religious purpose of the resolution, which was most obviously at issue there, as in the present case. If the resolution does not have a clearly secular purpose, then consideration of the others is unnecessary. While a proposed state act may be motivated in part by religion, it is unconstitutional "if it is entirely motivated by a purpose to advance religion." *Wallace,* 472 U.S. at 57, 105 S.Ct. at 2489.

■ In attempting to discern whether the government's purpose was to endorse or disapprove of religion in enacting the statute, the *Wallace* Court studied the legislative rec-

ord and whether in fact, if the statute had not been passed, the Alabama students in the *Wallace* case would have had the right to pray during a moment of silence. The Supreme Court found that the purpose of the legislature in enacting a law authorizing a moment of silence for "meditation or silent prayer" was to "convey a message of state endorsement and promotion of prayer", not merely to protect every student's right to engage in voluntary prayer, since every student already had that right. Inasmuch as no law was required to protect a student's right to pray, the Court found that, in the absence of a finding that the statute had no meaning, it had no secular purpose The *Wallace* Court concluded:

> Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion. The importance of that principle does not permit us to treat this as an inconsequential case involving nothing more than a few words of symbolic speech on behalf of the political majority.

472 U.S. at 56, 60, 105 S.Ct. at 2489–90, 2491–92.

With this rich tapestry of jurisprudential guidance from the Supreme Court, this Court must determine whether the disclaimer resolution mandated by the School Board passes the constitutional test.

## IV.

The School Board mandated that school teachers teaching the science lesson of evolution state that the School Board itself recognizes that this lesson is presented "to inform students of the scientific concept and not intended to influence or dissuade the Biblical version of Creation or any other concept." The School Board also required that school teachers advise students that they have the right to form their own opinions·on the theory of evolution, that they may "maintain beliefs taught by parents on this very important matter of the origin of life and matter" and that they "are urged to exercise critical thinking," "gather all information possible" and "closely examine each alternative toward forming an opinion." In the preamble to the disclaimer, the School Board states that it is intended as a "disclaimer from endorsement" of the theory of evolution.

■ A "disclaimer" is defined as "[a] repudiation or denial of a claim". Endorsement is "an act of endorsing," i.e., an act giving approval or sanction. *The American Heritage Dictionary of the English Language* (Houghton Mifflin Co. 1976). Thus, the School Board members intended to deny that it was approving the theory of evolution, yet the teaching of the theory of evolution is a required component of the curriculum of Louisiana Public Schools, including those in Tangipahoa Parish.

Both parties stipulated that critical thinking and gathering of information are encouraged in all classes, and specifically in science classes. It was also stipulated that "[e]ven before the Disclaimer resolution was adopted, teachers in Tangipahoa Parish had the right to mention viewpoints other than evolution to their students, and often discussed those viewpoints and encouraged students to explore them." Stipulations of Fact 9 and 10.

Therefore, it is undisputed that the teachers of Tangipahoa Parish public schools had the right to discuss alternate theories of the creation of life and could independently research such topics. It is also undisputed that there is no other scientific theory in the science curriculum of which the School Board disclaims endorsement. On no other topic in the science curriculum, or indeed in any other subject, does the School Board announce its intention *not to influence or dissuade* whatever opinion the student may already hold. Parents may deny consent to their children attending sex education or viewing the movie *Schindler's List,* but parental consent is not required prior to the teaching of any topic in the science curriculum, including evolution.

The discussion at the School Board meeting by the Board members, the public, and the sponsor of the resolution, E.F. Bailey, does not reveal a clearly secular purpose. Mr. Bailey candidly stated that he did not want evolution taught as fact because, in his opinion, it was terribly important that young-

sters not believe that human lives were the result of "an accident", that students would be confused by the teaching of evolution because it did not coincide with what they learned in Sunday School, and that this is a "very reasonable compromise" between the adoption of a policy allowing creationism to be taught, which was proposed and defeated a few months prior to the adoption of the disclaimer, and the teaching of evolution only in the science classes of the public schools of Tangipahoa Parish. Joint Exhibit 1, pp. 29–33.

In fact, it is patent that Bailey, and other School Board members, believed that teaching the theory of evolution is antithetical to the religious belief in the creation of life by a Divine Creator, that the proposal was introduced to satisfy similar religious concerns of majority of the constituency, and that if the proponents of Creation Science must accept the fact that it cannot be taught in the public schools, as it is taught in Sunday School, then the disclaimer is a "very reasonable compromise." Bailey also clearly underscored his fervent wish that the disclaimer be adopted so that the religious beliefs of students in Divine Creation not be undermined by the teaching of creation as an "accident" or by the "Big Bang theory", because other vital moral issues surround the importance of life, such as abortion and the crime rate. In fact, Bailey would not accept a proposal to delete the reference to "the Biblical version of Creation," because he believed it would "gut the basic message" of the disclaimer.

As hard as it tries to, this Court cannot glean any secular purpose to this disclaimer. While the School Board intelligently suggests that the purpose of the disclaimer is to urge students to exercise their critical thinking skills, there can be little doubt that students already had that right and are so urged in every class. The School Board also stresses that the point is that the teachers advise the students that they have the right to form their own opinions or maintain the beliefs taught to them by parents or in Sunday School on the origin of life. This Court can hardly conceive that students do not already have that right, or are unaware that they have it, or conversely, in its absence, that

teachers in Tangipahoa Parish public schools teach students that they do not have the right to believe in Divine Creation, if they so choose. As the *Wallace* Court recognized, if there is no clearly secular purpose to the act, the Court is left with but two conclusions: (1) the act was enacted for religious purposes, or to convey a message of endorsement of religion; or (2) the act had no purpose. In the absence of a finding that the School Board passed a meaningless or irrational resolution, the Court must find that the disclaimer was passed for religious reasons. A review of the all of the evidence presented leaves little doubt that the reasons for the adoption of the resolution were religious.

Even the School Board acknowledges the religious underpinnings of the disclaimer, if somewhat indirectly. It states in its Trial Brief that the "School Board approved the resolution as a means of responding to the sensibilities and sensitivities of a diverse, pluralistic student population and their parents" and as "a disclaimer from an official orthodoxy concerning a controversial topic upon which many hold strong but differing opinions." School Board Trial Brief, p. 2 and 3. These "sensibilities and sensitivities" are religious ones, however, because they relate to the espousal of parents and students of religion, "the expression of man's belief in and reverence for a superhuman power recognized as the creator and governor of the universe." *The American Heritage Dictionary of the English Language* (Houghton Mifflin Co. 1976). What offends parents, students, and School Board members about the teaching of evolution, and the reasons which underlay the Creation Science proponents, is that the teaching of the scientific theory of evolution in public schools is not accompanied by the theory, indeed the belief, that a Supreme Being was the designer and creator of humankind.

The School Board, in disclaiming evolution as an official orthodoxy, is expressing its view that, if the students believe or have been taught that the theory of evolution is essentially a religious teaching, the School Board officially denies approving of such spiritual doctrine. There is no secular purpose to this official denial. While many of

diverse religious beliefs may disagree with such a characterization of evolution, the manner and the contemporaneous proposal and adoption of the disclaimer, the discussions and comments at the School Board meeting during which it was passed, the testimony submitted at trial, and the historical context in which the subject arises, demonstrate by a preponderance of the evidence that religious concerns motivated the disclaimer.[5] In mandating this disclaimer, the School Board is endorsing religion by disclaiming the teaching of evolution in such a manner as to convey the message that evolution is a religious viewpoint that runs counter to the religious belief of the Biblical theory of Creation, or other religious views. An endorsement of religion is a violation of the Establishment Clause and thus must be invalidated.

The Court understands the well-intentioned motivations of the sponsors of the resolution, the Board Members who voted for it, and the constituency who urged passage· of it, and in no way intends to disparage those deeply held convictions which support the desire to encourage schoolchildren to maintain the religious or spiritual beliefs they are taught at home or in church. While encouraging students to maintain their belief in the Bible, or in God, may be a noble aim, it cannot be one in which the public schools participate, no matter how important this goal may be to its supporters. The reasons for the Establishment Clause to the Constitution of the United States have been recognized and reiterated by the Supreme Court in its many difficult confrontations with these issues, but it bears repeating that "[t]he place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of the government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality." *School District of Abington Township, Pa. v. Schempp*, 374 U.S. 203, 226, 83 S.Ct. at 1574, 10 L.Ed.2d 844 (1963).

Accordingly, for the above and foregoing reasons, the Court finds that the disclaimer is unconstitutional as it contravenes the Establishment Clause of the First Amendment, as made applicable to the states in the Fourteenth Amendment, of the United States Constitution, and Article 1, § 8 of the Louisiana Constitution. The Court shall enter judgment enjoining the reading of the dis-

---

5. The Supreme Court in *Edwards* recognized this characterization of the theory of evolution, noting that the passage of the Creationism Act by the Louisiana state legislature was, by admission of a state senator:

   [T]o redress the fact that theory of evolution incidentally coincided with what he characterized as religious beliefs antithetical to his own. The legislation therefore sought to alter the science curriculum to reflect endorsement of a religious view that is antagonistic to the theory of evolution. In this case, the purpose of the Creationism Act was to restructure the science curriculum to conform with a particular religious viewpoint. Out of many possible science subjects taught in the public schools, the legislature chose to affect the teaching of the one scientific theory that historically has been opposed by certain religious sects. .... [T]he legislature passed the Act to give preference to those religious groups which have as one of their tenets the creation of humankind by a divine creator.... Similarly, the Creationism Act is designed *either* to promote the theory of creation science which embodies a particular religious tenet by requiring that creation sci-

ence be taught whenever evolution is taught or to prohibit the teaching of a scientific theory disfavored by certain religious sects by forbidding the teaching of evolution when creation science is not also taught. The Establishment Clause, however, "forbids alike the preference of a religious doctrine *or* the prohibition of theory which is deemed antagonistic to a particular dogma." [*Epperson v. Arkansas*, 393 U.S. 97, 106–107, 89 S.Ct. 266, 271, 21 L.Ed.2d 228 (1968) (statute forbidding the teaching of evolution invalidated)]. Because the primary purpose of the Creationism Act is to advance a particular religious belief, the Act endorses religion in violation of the First Amendment.

*Edwards*, 482 U.S. at 593–594, 107 S.Ct. at 2582–2583. While many individuals who embrace Christianity or Judaism, and other religions, as their faiths believe both in the theory of evolution as a scientific explanation for the origin of life and in creation by a Divine Creator, it is evident that Bailey, who introduced the disclaimer, and the constituents on whose behalf he was acting, consider a belief in the theory of evolution and a belief in Divine Creation to be mutually exclusive.

claimer in the Tangipahoa Parish public schools and shall enter a declaratory judgment finding that the disclaimer violates the Establishment Clause of the United States Constitution, as contained in the First and Fourteenth Amendment, and Article 1, § 8 of the Louisiana Constitution.

Plaintiff is hereby directed to file any motion directed to the recovery of attorneys' fees and costs within 30 days of the date of entry of the judgment.

### *JUDGMENT*

Considering the record, the evidence presented by the parties in their stipulation of facts and submission of exhibits, the Findings and Conclusions entered by the Court this date, and the law, for the reasons assigned,

**IT IS ORDERED, ADJUDGED, AND DECREED** that there be judgment herein in favor of plaintiffs, Herb Freiler, Sam Smith, and John Jones, and against the defendants, Tangipahoa Parish Board of Education, E.F. Bailey, Robert Caves, Maxine Dixon, Leroy Hart, Ruth Watson, Donnie Williams, Sr., Art Zieske, and Ted Cason, declaring that the Disclaimer Resolution enacted by the Tangipahoa Parish Board of Education on April 19, 1994, is unconstitutional as it violates the Establishment Clause of the First and Fourteenth Amendments of the United States Constitution and Article 1, § 8 of the Louisiana Constitution, with costs.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the defendants be and are hereby **ENJOINED** from implementing the disclaimer resolution and requiring the teachers of the Tangipahoa Parish public schools to read the disclaimer. The reading of the disclaimer in the Tangipahoa Parish public schools by any teacher or school official is hereby **ENJOINED.**