FREEDOM FROM RELIGION FOUN-
DATION, INC., Anne Nicol Gaylor,
Annie Laurie Gaylor and Dan Barker,
Plaintiffs,

v.

R. James NICHOLSON, Michael J.
Kussman, Hugh Maddry, A. Keith
Ethridge and Jeni Cook, Defendants.

No. 06–C–212–S.

United States District Court,
W.D. Wisconsin.

Jan. 8, 2007.

Jean Lin, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiffs Freedom From Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor, and Dan Barker commenced this civil rights action in their capacity as federal taxpayers against defendants R. James Nicholson, Michael J. Kussman[1], Hugh Maddry, A. Keith Ethridge, and Jeni Cook alleging violations of the Establishment Clause of the First Amendment to the United States Constitution. Plaintiffs seek both declaratory and injunctive relief in this action. Jurisdiction is based on 28 U.S.C. § 1331. The matter is presently before the Court on defendants' motion for summary judgment. The following facts are either undisputed or those most favorable to plaintiffs.

## BACKGROUND

### A. The Parties

Plaintiff Freedom From Religion Foundation, Inc. (hereinafter FFRF) is a Wisconsin non-stock corporation with its principal place of business in Madison, Wisconsin. FFRF's declared purpose is to "protect the fundamental constitutional principle of separation of church and state by representing and advocating on behalf of its members." (Compl., ¶ 6).

Plaintiffs Anne Nicol Gaylor, Annie Laurie Gaylor, and Dan Barker are federal taxpayers and members of FFRF residing in Madison, Wisconsin.

Defendant R. James Nicholson is the Secretary of the Department of Veterans Affairs (hereinafter VA). Accordingly, he oversees and maintains responsibility for disbursement of congressional tax appropriations made to the VA including funds disbursed to VA's National Chaplain Center.

Defendant Michael J. Kussman is the Acting Under Secretary for Health for the VA. Additionally, defendant Kussman serves as the head of the Veterans Health Administration (hereinafter VHA). Accordingly, he oversees and maintains responsibility for disbursement of congressional tax appropriations made to the VHA including funds used to integrate chaplain services into VA's provision of health care.

Defendant Hugh Maddry is the Director of VA's National Chaplain Center. Accordingly, he oversees and maintains responsibility for disbursement and use of congressional tax appropriations made to the Center. Defendant A. Keith Ethridge is the Deputy Director of VA's National Chaplain Center. Accordingly, he is responsible for both supervising the Center's staff and managing its operational budget. Defendant Jeni Cook is VA's Associate Director for Spiritual Health Care Initiatives. Accordingly, she is responsible for developing spiritual health care initiatives in the areas of health promotion and disease prevention, spiritual health care initiatives for women veterans, and program development related to spiritual health care initiatives in veterans' homes and communities.

---

**1.** Pursuant to Fed.R.Civ.P. 25(d)(1), defendant Michael J. Kussman, the current Acting Under Secretary for Health for the Department of Veterans Affairs, is substituted for the former Under Secretary for Health Jonathan Perlin.

## B. VA's Chaplaincy Program

### 1. General Program Aspects

The VA health care system is highly integrated into the health care system of this country. This is evidenced by the fact that VA currently operates 154 medical centers with at least one center located in each state, Puerto Rico, and the District of Columbia. Additionally, VA operates more than 1,300 sites of care including 875 ambulatory care and community-based outpatient clinics, 136 nursing homes, 43 residential rehabilitation treatment programs, and 88 comprehensive home-care programs. Further, in the year 2005, over 5.3 million people received health care in VA facilities.

In its health care system, the VA provides a wide variety of benefits and services to both veterans of the United States military and their families. Among the services made available is pastoral and spiritual care provided by VA chaplains. The VA chaplaincy program has a long history of legislative approval and the practice of employing a chaplain to serve the religious needs of military veterans began as early as 1883. *See* By–Laws of The National Home for Disabled Volunteer Soldiers, Articles II and XVII, published in Laws and Regulations, National Home for Disabled Volunteer Soldiers (1883).

In the early beginnings, the primary focus of the VA chaplain was sacramental in nature and involved caring for seriously ill and dying patients, leading worship, and administering the sacraments. However, during the past ten years the VA chaplaincy has developed a more clinical focus. Accordingly, today's clinical chaplains draw from both the behavioral sciences and theological reflection in understanding the human condition. It is the chaplaincy's clinical focus that is at issue in this action.

### 2. Clinical Chaplaincy and Integration into Patient Care

VA chaplains have a three-fold responsibility to patients at every VA facility. First, VA chaplains ensure that patients (both inpatients and outpatients) receive appropriate clinical pastoral care. Second, VA chaplains ensure that each patient's constitutional right to free exercise of religion is protected. Finally, VA chaplains protect patients from having religion imposed upon them.

In accordance with chaplains' responsibilities and as part of VA's clinical chaplaincy focus, the VA believes that the spiritual dimension of health must be integrated into all aspects of patient care, research, emergency preparedness, and health care education. Accordingly, a "clinical chaplain" is an individual who: (1) meets all VA qualifications for chaplain, (2) provides spiritual and pastoral care characterized by in-depth assessment, evaluation, and treatment of patients, (3) has a high degree of integration into the total care and treatment program of a health care facility; and (4) has close working relationships with staff members of other professional health care disciplines.

To effectively implement its clinical chaplaincy program, the VA Chaplain Service was recently reorganized under the Medicine and Surgery Strategic Healthcare Group. The purpose of this reorganization was to recognize VA's chaplaincy as a clinical, direct patient care discipline. Accordingly, VA chaplains must be both professionally educated and ecclesiastically endorsed by a particular faith tradition.[2]

**2.** An ecclesiastical endorsement is a written official statement by the official national endorsing agent of a religious faith group certi-

Additionally, chaplains employed by VA must be trained in either Clinical Pastoral Education (hereinafter CPE) which is an interfaith professional education for ministry or in its equivalent. CPE teaches its students how to help hospital patients and others as they deal with existential questions and similar issues dealing with the meaning of life. A chaplain using CPE principles allows patients to direct conversations and to identify both their concerns and available resources for dealing with their situations. Additionally, a chaplain trained in CPE avoids initiating or guiding religious instruction. However, professional chaplains are trained to encourage helpful religious and spiritual coping processes.

It is undisputed that VA policy prohibits proselytizing. Additionally, it is undisputed that VA chaplains are proactive in eliminating proselytizing from their hospitals. As such, VA pastoral care is religious in content only if that is the wish of a given patient. Additionally, providing pastoral care need not involve religion at all. The concept of spirituality is likewise at issue in this action. According to VA definition, spirituality is not necessarily religious because it concerns the meaning of life on a more general level. Accordingly, defendants contend that spiritual care involves providing counseling services to patients who wish to discuss issues concerning the meaning of life particularly as such issues concern the patient's medical situation. As with pastoral care, the provision of spiritual care is religious in content only if that is the patient's wish. Accordingly, it is undisputed that VA chaplains provide spiritual and pastoral care to both religious and non-religious patients.

Additionally, VA chaplains provide pastoral and spiritual care only to patients who want their services. As such, access to pastoral and spiritual care in the VA system is completely voluntary. It is undisputed that one of VA's purposes in providing pastoral and spiritual care to its patients is to assist in healing the sick.

### 3. *Spiritual Assessments*

VA facilities seek accreditation from the Joint Commission on Accreditation of Healthcare Organizations (hereinafter JCAHO). JCAHO is an independent, not-for-profit, nationally recognized organization that evaluates and accredits health care organizations and programs in the United States. Section one of the JCAHO Comprehensive Accreditation Manual for Hospitals addresses the "Provision of Care, Treatment, and Services (PC)" provided by hospitals. Among the standards included in said section is Standard PC.2.20 which anticipates that each patient will undergo both an initial assessment and a re-assessment if necessary.

One type of assessment Standard PC.2.20 requires as part of an initial assessment is a spiritual assessment. A spiritual assessment is required to meet JCAHO standards because hospitals must accommodate a patient's right to pastoral and spiritual services. Accordingly, pursuant to JCAHO requirements, spiritual assessments should "at a minimum, determine the patient's denomination, beliefs, and what spiritual practices are important to the patient." As such, a VA patient's spiritual status is assessed both as a matter of VA policy and pursuant to JCAHO requirements. VA policy requires spiritual assessments because VA utilizes a holistic health care model in which addressing the spiritual dimension of each patient is necessary.

In the 1990's, Chaplain Gary Berg developed a Computer Assessment Program

fying that an individual is in good standing with his or her religious faith group.

(hereinafter CAP) which was a religiously based in-depth spiritual assessment. The CAP was intended to better understand the role religious faith plays in the maintenance of health, healing of diseases, and coping with chronic illness and losses in people's lives. Accordingly, the CAP asked questions such as: (1) How often do you attend religious services during the year,? (2) How much is religion (and/or God) a source of strength and comfort to you,? (3) How often do you privately pray;? and (4) How often do you read the Bible or other religious literature? Plaintiffs assert the VA's National Chaplain Center still utilizes the CAP, now referred to as the "Living Water Computer Assessment Program." However, Mr. William Kinnaird, Associate Director of VA's National Chaplain Center, indicates that the CAP is not a standard VA assessment. Additionally, he indicates that VA computers do not currently support the CAP software as originally developed. However, Mr. Kinnaird concedes that many VA chaplains used the CAP as a source for creating their own assessments.

One tool that does remain available to all VA chaplains is the Spiritual Assessment Inventory. Said inventory contains questions that are broken down into four categories. These categories are as follows: (1) Organized Religious Activity Scale, (2) Subjective Religious Scale, (3) Non-organized Religious Activity Scale; and (4) Spiritual Injury Scale. Additionally, the Spiritual Assessment Inventory includes a Religious Resource Index and a score of fifteen or lower on this index indicates that the patient should be referred to chaplain services.

An example of a spiritual assessment currently in use by VA Medical Centers is the Spiritual Needs Assessment for the VA Healthcare Network of Upstate New York. This assessment asks questions such as: (1) What is your religious preference,? (2) How often do you attend church, synagogue, or other religious meetings,? (3) Do you consider religious or spiritual beliefs to be important in your life,? (4) Does your faith or beliefs influence the way you think about your health or the way you take care of yourself,? (5) Would you like to receive any devotional materials while you are hospitalized;? and (6) Would you like to address any religious or spiritual issues with a chaplain? Additionally, the assessment contains the following language: "[c]ompleting this assessment questionnaire will help us to better understand your spiritual care needs. We believe that faith plays an important role in a person's sense of health and wellness." Defendants admit that some VA assessments can be conducted on a very in-depth basis. However, they state that if a patient indicates either verbally or otherwise that he or she has no interest in receiving spiritual or pastoral care such a response ends the spiritual assessment.

Additionally, defendants assert there is a difference between spiritual assessments and spiritual screening. According to defendants, "spiritual screening" is what is often done during the intake admission process while "spiritual assessments" describe the more in-depth analysis of a patient's spiritual and personal values, beliefs, and preferences. Defendants assert spiritual screening is necessary not only to comply with JCAHO standards but also to ensure that a patient's religious rights are protected. For example, defendants contend that a spiritual screening can determine whether a patient has specific religious needs such as the need for a religiously-motivated dietary restriction while spiritual assessments are only administered under certain circumstances. According to defendants, these circumstances are as follows: (1) when a patient falls into one of the categories for which

JCAHO requires it including patients with end-of-life issues, patients entering long-term care, patients with behavioral health issues, and patients with substance abuse issues; and (2) when a patient indicates that he or she both needs and consents to such an in-depth assessment.

### 4. *Outpatient Pastoral Care*

In the past ten years, VA chaplains have expanded their services to include spiritual care and counseling to outpatient veterans. The goal is to provide care from a veteran's initial visit that continues as he or she receives any VA services necessary to sustain his or her spiritual health. The VA believes it is imperative for veterans living outside the local daily distances to major VA health care facilities to have access to professional spiritual and pastoral care because research studies have shown "that when outpatients have access to quality spiritual and pastoral care significant improvement in quality of life, reduced inpatient admissions and costs savings result." Additionally, the VA believes that holistic health care and spiritual and religious needs go "hand-in-hand." Today over 80% of veterans seen at many VA facilities arrive as outpatients.

An example of a VA center providing outpatient pastoral care is the Asheville VA Medical Center in Asheville, North Carolina. Asheville's chaplain support team has provided pastoral care in its Ambulatory, Outpatient, and Primary Care settings since 1995 and its chaplains have been actively involved in outpatient care since 1996. Additionally, Asheville's chaplains have developed, tested, and validated a spiritual screening tool which is given to all new patients in both the Primary Care clinics and the Preventative Health Clinic. According to literature from the Asheville VA Medical Center, "[t]his begins a continuum of pastoral care that not only ad-

dresses each patient's immediate need for chaplain intervention, but that follows the patient through all future visits to the medical center."

### 5. *VA Treatment Programs*

Plaintiffs expressly challenge treatment programs currently implemented at four separate VA facilities: (1) Dayton VA Medical Center, (2) Sheridan, Wyoming VA Medical Center, (3) Gainesville, Florida VA Medical Center; and (4) Detroit, Michigan VA Medical Center.

At the Dayton VA Medical Center Chaplain Nancy Dietsch integrates the use of Lament and Fowler's Stages of Faith Development into her treatment of patients with post-traumatic stress disorder. Chaplain Dietsch develops a series of lectures for the veterans which present Fowler's Stages of Faith Development. Additionally, Chaplain Dietsch couples that with poetry, meaningful quotes, children's stories, film clips, and music to evoke memory and experiences illustrating the various stages. After her presentations, Chaplain Dietsch introduces the veterans to the Lament as a form of prayer. She briefly discusses the components of the Lament (which includes addressing the Lament to either God or a higher power) and then invites the veterans to contribute to a group Lament. However, it is undisputed that Chaplain Dietsch's program is offered on a voluntary basis.

The Sheridan VA Medical Center provides a drug and alcohol treatment program entitled the Spiritual Recovery Support Group (hereinafter SRSG). The purpose of SRSG is to provide intervention and support to veterans suffering from low self-esteem because of significant spiritual injuries. Additionally, SRSG is used as an attempt to bring the spiritual components of faith and God's grace to bear on treatment and enhance

the health care recovery of veterans. The SRSG is also seen as a vehicle for change and growth because (according to the VA) when "God's gift of spiritual faith and grace is applied, it is good medicine." Finally, the SRSG incorporates the idea that God sees the veterans of infinite worth and value and that God wants them to treat themselves with "His grace and mercy as His precious child." Sheridan's chaplain staff believes that such an idea can be an important concept in helping veterans recover.

All veterans who enter the drug and alcohol treatment program at Sheridan VA Medical Center are given a Multi-level Spiritual Assessment Test (hereinafter MLSA). When a veteran scores a significant spiritual injury (as measured by the MLSA) it is recorded and sent to the treatment team. A recommended intervention is then made that the veteran attend the SRSG. However, it is undisputed that attendance at the SRSG is voluntary.

The VA Medical Center in Gainesville, Florida likewise incorporates spirituality into its detoxification treatment program. This program is entitled Spirituality in Substance Abuse Detoxification Treatment and it is offered to veterans on a voluntary basis. The program's objective is to introduce a practical spirituality during detoxification to enhance both participation in twelve-step programs and awareness of internal values and core beliefs. The focus of the program is on recovery spirituality which does possess a religious component. However, defendants assert it "has more to do with the mind-body-spirit connection of how the patient's own internal values and core beliefs affect self-esteem, relationships with others, and his/her Higher Power."

Finally, the Detroit VA Medical Center likewise integrates spirituality into its chemical dependency treatment program. The purpose of this incorporation is to "better integrate the spiritual side of the chemical dependency program into the multi-disciplinary treatment plan so treatment can be approached from a holistic perspective." To assist in achieving this purpose, a spiritual assessment is administered which is found along side every other clinical document the hospital team provides in patient care.

Once a patient completes the assessment, the spiritual clinician devises a treatment plan. A treatment plan begins with a diagnosis. From the diagnosis, the chaplain will identify the patient's short-term inpatient goals which usually involve: (1) spiritual introspection, (2) relapse insight; and (3) learning the Twelve Steps of Alcoholics Anonymous. A veteran is provided ten days to complete the short-term goals and a treatment review is conducted after approximately nine days. If the patient's short-term goals have been met, he or she is ready for approximately five and one-half months of intensive outpatient treatment. As with all other challenged programs, Detroit VA Medical Center's spiritual chemical dependency program is offered to veterans on a voluntary basis.

## MEMORANDUM

Defendants assert nothing in the United States Constitution requires VA Medical Centers to ignore the religious predilections of their patients. Rather, defendants assert from a constitutional standpoint it is perfectly acceptable for VA facilities to try and heal their patients in a manner consistent with the standard of medical care in this country. This includes paying attention to a patient's spiritual or religious needs. Additionally, defendants assert VA chaplains follow the lead of their patients in determining whether to include any religious content in their counseling services or even whether to provide any counseling

at all. Finally, defendants assert all veterans are entitled to receive the services offered by the VA including pastoral and spiritual care and this is true regardless of whether the veteran is religious or non-religious. Accordingly, defendants argue their motion for summary judgment should be granted because the challenged aspects of VA's chaplaincy program do not violate the Establishment Clause.

Plaintiffs concede that VA chaplains are entitled to perform religious activities to accommodate the constitutional free exercise rights of their hospitalized patients. However, plaintiffs assert this legitimate role does not allow VA chaplains to promote religion over non-religion without restraint. Additionally, plaintiffs assert this legitimate role does not allow VA chaplains to provide religious services to veterans (such as outpatients) whose free exercise rights are neither burdened nor restrained. As such, plaintiffs assert VA chaplains have crossed the constitutional line by incorporating religion into the delivery of VA health care services. Accordingly, plaintiffs argue defendants' motion for summary judgment should be denied because aspects of VA's chaplaincy program do violate the Establishment Clause.

### A. Standard of Review

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over unnecessary or irrelevant facts will not preclude summary judgment. *Id.* Further, a factual issue is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Id.* A court's role in summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

To determine whether there is a genuine issue of material fact for trial courts construe all facts in the light most favorable to the non-moving party. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir.2003) (citation omitted). Additionally, a court draws all reasonable inferences in favor of that party. *Id.* However, the non-movant must set forth "specific facts showing that there is a genuine issue for trial" which requires more that "just speculation or conclusory statements." *Id.* at 283 (citations omitted). If a court determines that the material facts are not in dispute then the "sole question is whether the moving party is entitled to judgment as a matter of law." *Santaella v. Metro. Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir.1997) (citation omitted).

### B. First Amendment Background and Jurisprudence

As the Court previously stated in its memorandum and order on defendants' motion to dismiss, religious freedom is a basic tenet of this nation. Many of those who either formed this nation or immigrated here left their homelands to escape religious persecution seeking the right to worship without governmental interference. The First Amendment to the United States Constitution protects religious freedom by providing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

The first of the two clauses is commonly referred to as the Establishment Clause and it commands a separation

of church and state. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2120, 161 L.Ed.2d 1020 (2005). In other words, the Establishment Clause prevents the government from either promoting any religious doctrine or organization or affiliating itself with one. *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 590, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989). The second clause is commonly referred to as the Free Exercise Clause and it mandates government respect for and non-interference with "the religious beliefs and practices of our Nation's people." *Cutter,* at 719, 125 S.Ct. at 2120. While these two fundamental clauses express complementary values they are frequently in tension with one another. *See Locke v. Davey,* 540 U.S. 712, 718, 124 S.Ct. 1307, 1311, 158 L.Ed.2d 1 (2004) (citation omitted). This frequent tension is once again evidenced by the challenges presented in this action.

The Supreme Court has long recognized that government may, and indeed sometimes must, accommodate religious practices and such accommodation can be achieved without violating the Establishment Clause. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 334, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987)(quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 144–145, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (1987)(footnote omitted)). Additionally, it is well-established that "limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz v. Tax Comm'n of the City of New York,* 397 U.S. 664, 673, 90 S.Ct. 1409, 1413–1414, 25 L.Ed.2d 697 (1970). Accordingly, under the First Amendment there is ample "room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.* at 669, 90 S.Ct. at 1412. However, this premise does not mean that all accommodation is permitted because at some point accommodation may devolve into "an unlawful fostering of religion." *Amos,* at 334–335, 107 S.Ct. at 2868 (quoting *Hobbie,* at 145, 107 S.Ct. at 1051).

■ Though a variety of approaches have been utilized to determine when state action goes beyond accommodation and in turn violates the Establishment Clause, at the heart of the Clause is the principle that government, either state or federal, should pursue a course of neutrality which favors neither one religion over another nor favors religion generally to non-religion. *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 696, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) (citations omitted).

■ Additionally, in an attempt to help lower courts identify improper sponsorship, financial support, or active involvement of government in religious activity the United States Supreme Court developed a three-prong test to determine whether a statute or program complies with the mandates of the Establishment Clause. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under this "Lemon" test a program does not violate the Establishment Clause if: (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create excessive entanglement between government and religion. *Id.* at 612–613, 91 S.Ct. at 2111 (citations omitted). In *Agostini v. Felton,* 521 U.S. 203, 222–223, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997), the Supreme Court modified the *Lemon* test emphasizing the continuing importance of the first two prongs but determining that entanglement could be

considered an aspect of the second prong's "effect" inquiry.

▮ In *Agostini*, the Court used "three primary criteria" in evaluating whether government action has the primary effect of advancing religion: (1) whether the statute or program in question result[s] in governmental indoctrination, (2) whether the statute or program defines its recipients by reference to religion; or (3) whether the statute or program creates an excessive entanglement. *Id.* at 234, 117 S.Ct. at 2016. However, for a law or program to have such forbidden "effects" it must be fair to say that government itself has advanced religion through its own activities and influence. *Amos,* at 337, 107 S.Ct. at 2869.

First, it is important to note at the outset that plaintiffs are not challenging the overall existence of VA's chaplaincy program. Rather, they are challenging certain aspects of the program which are as follows: (1) the clinical focus of the program and its integration into patient care, (2) the spiritual assessment requirement, (3) providing pastoral care to outpatients; and (4) the integration of spirituality and/or religion into VA treatment programs. The Court will apply the *Lemon/Agostini* test to aspects of VA's chaplaincy program being challenged by plaintiffs to determine whether these aspects violate the Establishment Clause.

### 1. Secular Purpose

▮ The " 'purpose' " inquiry of the *Lemon* test " 'asks whether the government's actual purpose is to endorse or disapprove of religion.' " *Books v. Elkhart County, Ind.,* 401 F.3d 857, 863 (7th Cir.2005)(*quoting Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)). The government's articulation of a secular purpose is "insufficient by itself to avoid conflict with the First Amendment." *Id.* (citation omitted). However, courts generally defer to the purpose offered by the government "as long as it is not a sham." *Ind. Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 771 (7th Cir.2001).

The Supreme Court has determined that government action lacks a valid secular purpose only when there is "no question that the statute or activity was motivated wholly by religious considerations." *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) (citations omitted). Accordingly, the secular purpose requirement does not mandate that the government's purpose must be completely unrelated to religion. *Am. Jewish Cong. v. City of Chicago,* 827 F.2d 120, 126 (7th Cir.1987) (citation omitted). Such a mandate would amount to a requirement that " 'the government show a callous indifference to religious groups' " and the Establishment Clause has never been interpreted in such a manner. *Amos,* at 335, 107 S.Ct. at 2868 (*quoting Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)). Rather, *Lemon's* purpose requirement aims at "preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Id.* The Court finds the undisputed facts of this action establish that all aspects of VA's chaplaincy program being challenged by plaintiffs have a valid secular purpose.

▮ The Court will first address plaintiffs' first and fourth challenged aspects together because they are similar in nature. Plaintiffs challenge the clinical focus of the chaplaincy program and its integration into patient care and they likewise challenge the integration of religion and/or spirituality into VA treatment programs. When faced with facts very similar to the ones present here, the Court of Appeals

for the Eighth Circuit determined that hiring a chaplain to "enhance [the hospital's] holistic treatment approach to patient care" serves the valid secular purpose of helping patients get well. *Carter v. Broadlawns Medical Ctr.,* 857 F.2d 448, 454–455 (8th Cir.1988). It is undisputed that one of VA's purposes in providing pastoral and spiritual care to its patients is to assist in healing the sick. Assisting in healing the sick is "not a sham" secular purpose and as such integrating a clinical chaplaincy program into VA's holistic approach to patient care satisfies the first prong of the *Lemon* test. Additionally, it is undisputed that spirituality is incorporated into certain VA treatment programs so such treatment can be approached from a holistic perspective. Under *Lemon,* this is likewise a valid secular purpose.

Next, the Court will address VA's requirement that its patients complete a spiritual assessment. It is undisputed that: (1) VA facilities seek accreditation from JCAHO; and (2) JCAHO standards require hospitals to administer spiritual assessments to their patients in an effort to accommodate a patient's right to pastoral and spiritual services. Administering spiritual assessments to VA patients in an attempt to comply with an accreditation body's standards is a valid secular purpose under *Lemon.*

Finally, the Court will address VA's practice of providing pastoral care to outpatients. The VA believes it is imperative for veterans living outside the local daily distances to major VA health care facilities to have access to professional spiritual and pastoral care because research studies have shown "that when outpatients have access to quality spiritual and pastoral care significant improvement in quality of life, reduced inpatient admissions and costs savings result." VA's desire to improve a veteran's quality of life and its ambition to reduce operating costs are both valid secular purposes for providing outpatient pastoral care under *Lemon.*

### 2. Principal or Primary Effect/Excessive Entanglement—Lemon/Agostini test

■ As previously stated, the Supreme Court in *Agostini* used "three primary criteria" in evaluating whether government action has the primary effect of advancing religion: (1) whether the statute or program in question results in governmental indoctrination, (2) whether the statute or program defines its recipients by reference to religion; or (3) whether the statute or program creates an excessive entanglement. *Agostini,* at 234, 117 S.Ct. at 2016. However, for a law or program to have forbidden "effects" it must be fair to say that government itself has advanced religion through its own activities and influence. *Amos,* at 337, 107 S.Ct. at 2869. The undisputed facts of this action establish that none of the aspects of VA's chaplaincy program being challenged by plaintiffs have the principal or primary effect of advancing religion. First, plaintiffs do not assert that VA's chaplaincy program defines its recipients by reference to religion. Accordingly, the Court will focus its analysis on the remaining criteria.

### a. Governmental Indoctrination

The Court finds that all aspects of VA's chaplaincy program being challenged by plaintiffs do integrate religion and/or spirituality at some level. The Court does not believe that defendants could candidly argue otherwise. First, as part of its clinical chaplaincy focus the VA believes that the spiritual dimension of health must be integrated into all aspects of patient care. Additionally, VA requires that all chaplains must be ecclesiastically endorsed by a particular faith tradition. Further, spiri-

tual assessments currently in use by the VA system ask explicitly religious questions such as "What is your religious preference?" and many VA chaplains have used Chaplain Berg's religiously based CAP as a source for creating their own assessments. Next, VA chaplains provide spiritual care and counseling to outpatient veterans whose free exercise rights are arguably neither burdened nor restrained because VA believes that holistic health care and spiritual and religious needs go "hand-in-hand." Finally, many of VA's treatment programs integrate religion and/or spirituality into their protocol by: (1) using Lament and Faith Development, (2) teaching the Twelve Steps of Alcoholics Anonymous; or (3) bringing the spiritual components of faith and God's grace to bear on treatment.

 However, this finding is not dispositive because the Supreme Court has determined that "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Van Orden v. Perry,* 545 U.S. 677, 125 S.Ct. 2854, 2863, 162 L.Ed.2d 607 (2005) (citations omitted). This is because government is not constitutionally required to be hostile to religion or to " 'throw its weight against efforts to widen the effective scope of religious influence.' " *Id.* at 2859 (citation omitted). Rather, to establish governmental indoctrination plaintiffs must establish that any religious indoctrination that occurs could reasonably be attributed to governmental as opposed to private action. *Agostini,* at 226, 117 S.Ct. at 2012 (question of governmental indoctrination hinges on whether funding is result of private decision of individuals and could not be attributed to state decision making) (citation omitted). It is undisputed that all aspects of VA's chaplaincy program being challenged by plaintiffs involve private decision making. Accordingly, there is no evidence that any religious indoctrination could reasonably be attributed to governmental as opposed to private action.

Voluntariness lies at the heart of each and every aspect of VA's chaplaincy program being challenged by plaintiffs. In terms of its clinical chaplaincy program and integration into patient care, VA chaplains do not incorporate religious content into either their pastoral care or spiritual counseling unless that is the patient's wish. Additionally, VA chaplains provide spiritual and pastoral care to both religious and non-religious patients but only if they desire such services. Accordingly, the choice to receive such care remains a private choice of the patient. VA's spiritual assessments are likewise voluntary (despite the fact that they are administered to all VA patients) because if a patient indicates either verbally or otherwise that he or she has no interest in receiving spiritual or pastoral care such a response ends the spiritual assessment. Finally, it is undisputed that all VA treatment programs (inpatient or outpatient) are offered on a voluntary basis.

While the Supreme Court has determined that "[t]he Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion ...," *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962) this principle has been largely applied to school prayer cases because of the inherent vulnerability of young impressionable students. *See Lee v. Weisman,* 505 U.S. 577, 592, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992)(noting heightened concerns of subtle coercive pressures in the elementary and secondary schools). Such a concern is not present here.

Additionally, the Seventh Circuit has considered the role coercion and free

choice play in its Establishment Clause jurisprudence. In *Freedom from Religion Found., Inc. v. McCallum,* 324 F.3d 880, 881–884 (7th Cir.2003), the Seventh Circuit determined that Wisconsin correctional authorities could both provide funding to and recommend a Christian based halfway house named Faith Works. The Court determined such action was permissible because it was the private choice of the offender. *Id.* at 882. The same can be said for every aspect of VA's chaplaincy program being challenged by plaintiffs. The choice to receive spiritual or pastoral care, the choice to complete a spiritual assessment, and the choice to participate in a religious or spiritually based treatment program always remains the private choice of the veteran. Accordingly, there is no evidence of governmental indoctrination of religion.

However, this does not end the Court's analysis as the issue concerns outpatient pastoral care because plaintiffs likewise challenge this aspect of VA's chaplaincy program as unnecessary to accommodate the free exercise rights of non-hospitalized veterans. Plaintiffs' challenge may be true. However, it is well-established that "limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz,* at 673, 90 S.Ct. at 1413–1414. Under the First Amendment, there is ample "room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.* at 669, 90 S.Ct. at 1412. This aspect of accommodation by VA to its outpatients falls within the "room for play in the joints." Accordingly, it is permissible under the First Amendment. The reasoning of the Court of Appeals for the Eighth Circuit in *Carter* is helpful to the Court's analysis. In *Carter,* the Eighth Circuit did not rest its holding on

patient mobility. Rather, it determined that it was appropriate to allow the chaplain to counsel outpatients because "[a]llowing the chaplain to counsel outpatients has the same therapeutic value as letting her counsel inpatients." *Carter,* at 457. The same is true here. Accordingly, VA's provision of pastoral care to outpatient veterans is constitutionally permissible.

**b. *Excessive Entanglement***

It is important to note at the outset that not all entanglements between government and religion have the effect of advancing religion because interaction between church and state is inevitable. *Agostini,* at 233, 117 S.Ct. at 2015 (citation omitted). Entanglement must be "excessive" before it runs afoul of the Establishment Clause. *Id.* In assessing excessive entanglement, courts examine the "character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon,* at 615, 91 S.Ct. at 2112. Accordingly, excessive entanglement exists where: "(i) the program would require 'pervasive monitoring by public authorities' to ensure that [the publicly funded employees] did not inculcate religion; (ii) the program required 'administrative cooperation' between [government and sectarian organizations]; and (iii) the program might increase the dangers of 'political divisiveness.'" *Agostini,* at 233, 117 S.Ct. at 2015 *(citing Aguilar v. Felton,* 473 U.S. 402, 413–414, 105 S.Ct. 3232, 3238–3239, 87 L.Ed.2d 290 (1985)). Again, the undisputed facts of this action establish that excessive entanglement is not present in this action.

It is undisputed that VA policy prohibits proselytizing. Additionally, it is undisputed that VA chaplains are proactive in eliminating proselytizing from their hospitals.

Accordingly, plaintiffs failed to present any evidence demonstrating that publicly paid VA chaplains need to be pervasively monitored while implementing the challenged aspects of VA's chaplaincy program to ensure they do not inculcate religion and plaintiffs are not entitled to rely on speculation. *Heft*, at 283. Additionally, plaintiffs failed to present any evidence that the challenged aspects of VA's chaplaincy program might increase the danger of political divisiveness. The VA chaplaincy program has a long history of legislative approval and the practice of employing a chaplain to serve the religious needs of military veterans began as early as 1883. While VA's clinical chaplaincy focus has only developed during the past ten years, plaintiffs failed to present any evidence that such a focus will increase the danger of political divisiveness and again plaintiffs are not entitled to rely on speculation. *Id.* Accordingly, there is no evidence establishing that there is excessive entanglement between government and religion.[3] As such, all aspects of VA's chaplaincy program being challenged by plaintiffs are constitutionally permissible under the First Amendment because they do not have the principal or primary effect of advancing religion.

Interestingly, it is the relief requested by plaintiffs that would actually lead to excessive entanglement between government and religion. Plaintiffs request an order requiring defendants to establish rules, regulations, prohibitions, standards and oversight to ensure that future disbursements are not made and/or used to fund activities that include religion as a substantive integral component of the VA's medical treatment protocols.

Such pervasive monitoring would excessively entangle the government with religion and would run afoul of the Establishment Clause.

The undisputed facts of this action establish that none of the aspects of VA's chaplaincy program being challenged by plaintiffs violate the Establishment Clause. While the parties do dispute some issues of fact, their disputes are over facts which are not material to disposition of the action. As previously stated, disputes over unnecessary or irrelevant facts will not preclude summary judgment. *Anderson,* at 248, 106 S.Ct. at 2510. Accordingly, even construing all facts in the light most favorable to plaintiffs, the Court finds that no genuine issue of material fact remains for trial. *Heft,* at 282 (citation omitted). As such, defendants' motion for summary judgment is granted.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that judgment be entered in favor of defendants against plaintiffs dismissing plaintiffs' complaint with prejudice and costs.

---

**3.** The second factor enumerated in *Agostini* "administrative cooperation between government and sectarian organizations" is not applicable here because VA is not at its core a sectarian organization.